UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

JOSEPH J. CARREL, JR., LINDA )
BROWN, CATHY L. COURTNEY, PETER )
R. RAY, JOYCE L. RAY, MARK T. )
CASEY, RONALD S. WILSON, SR., )
STEPHEN TETRICK, Estate of RON )
CLOUSE, and PATTI CLOUSE, )
      Plaintiffs, )
 )
vs. )      1:05-CV-1769-SEB-JPG
 )
GEORGE WESTON BAKERIES )
DISTRIBUTION INC., )
      Defendant. )

**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Partial Summary Judgment filed by Defendant

George Weston Bakeries Distribution Inc. ("GWBD") and its related Motion to Exclude

or Limit Testimony of Plaintiffs' Damages Expert and Plaintiffs' Treating Physicians.

See Docket Nos. 123, 124 and 145.  GWBD requests that the Court enter judgment in its

favor and against the Plaintiffs, Joeseph J. Carrel, Jr., Linda Brown, Cathy L. Courtney,

Peter R. Ray, Joyce L. Ray, Mark T. Casey, Ronald S. Wilson, Sr., Stephen Tetrick, Ron

Clouse,[1] and Patti Clouse on Counts I through VII of Plaintiffs' Amended Verified Complaint (Docket No. 75),[2] pursuant to Federal Rule of Civil Procedure 56.  GWBD seeks summary judgment against the Plaintiffs and a declaration that, as a matter of law, GWBD did not violate: 1) the Clayton Act, 15 U.S.C. § 15 (Count II); 2) the Indiana Franchise Disclosure Act, Ind. Code § 23-2-2.5-1, et seq. (Count III); 3) the Indiana Deceptive Franchise Practices Act, Ind. Code § 23-2-2.7-1, et seq. (Count IV); or 4) the Indiana Criminal Deception Statute , Ind. Code § 35-43-2-5 (Count VI).  In addition, GWBD asks the Court to find that it did not breach the Distribution Agreement (Count V) or intentionally inflict emotional distress upon Plaintiffs (Count VII).  Finally GWBD argues that, as a matter of law, Plaintiffs are not entitled to injunctive relief (Count I).[3]  In response, Plaintiffs argue that material issues of fact exist as to each of the Plaintiffs' claims as set out in Counts I through Counts VII, thus defeating Defendants' entitlement to summary judgment on all of Plaintiffs' causes of action.

As a preliminary matter, we now hereby <u>GRANT</u> Plaintiffs' Motion for Leave to File Brief Responding to Defendant's Motion for Partial Summary Judgment in Excess of the Court's Page Limitation [Docket No. 142] as well as GWBD's Motion for Leave to

---

[1] Plaintiff Ron Clouse passed away in December 2006, and his Estate has been substituted as a plaintiff.

[2] GWBD does not seeks summary judgment on the portion of Count IV of Plaintiffs' Amended Complaint which claims that the waiver of jury trial provision of the Distribution Agreement violates Ind. Code § 23-2-2.7-1(10)'s prohibition on limiting litigation.  GWBD's Motion at 1.

[3] In Count I of their Amended Complaint, Plaintiffs seek a preliminary and permanent injunction.

File Its Reply in Support of Its Motion for Partial Summary Judgment in Excess of the Court's Page Limitation [Docket No. 149]. These enlargements are justified by the fact that Defendant's Motion for Partial Summary Judgment addresses all seven counts brought against it in the Plaintiffs' Amended Complaint, making the requested additional fourteen pages for the response brief and seven pages for the reply brief reasonable.

For the reasons explained below, summary judgment is <u>GRANTED</u> in favor of Defendant GWBD on Count I of the Amended Complaint as to the preliminary injunction, but we reserve any ruling as to whether the Plaintiffs might be entitled to a permanent injunction on Plaintiffs' remaining substantive claims. GWBD's Motion for Summary Judgment is also <u>GRANTED</u> on Count II of the Amended Complaint alleging antitrust violations, on Count III asserting violations of Indiana's Franchise Disclosure Act, Count VI alleging criminal deception, and Count VII alleging intentional infliction of emotional distress. Summary Judgment is <u>DENIED</u> on all claims alleged in Count IV under the Indiana Deceptive Franchise Practices Act and Count V which alleges breach of contract claims.

<u>STATEMENT OF MATERIAL FACTS</u>

**A.  GWBD's Pre-Franchise Offering**

George Weston Bakeries Distribution, Inc. ("GWBD") oversees distribution for, and is a wholly-owned subsidiary of, George Weston Bakeries, Inc., which manufactures certain food products for sale in retail outlets across the United States, including stores in Indiana. (Pls.' Resp. at 7, citing Dkt. 75, Amended Complaint, ¶7.) Historically, the

brand products manufactured and sold by GWBD were distributed by GWBD employees. In 1997, all GWBD employees/distributors became independent contractors or independent operators ("IOs") who thereafter distributed brand inventory through their owned or leased vehicles insured by the distributors.  (Pls.' Resp. at 7, citing Ex. A, Affidavit of Joseph Carrel ("2nd Carrel Aff."), ¶7; Ex. L, Deposition of Larry Bilello ("Bilello Dep."), pp. 12, 18 Ex. 1, p. 69.)

By mid-October 2004, all Plaintiffs were GWBD "non-equity" IOs,[4] who distributed GWBD products within exclusive sales areas that included various retail outlets who either were purchasers or potential purchasers of GWBD baked food products. (2nd Carrel Aff, ¶8.)  GWBD contracted with the IOs to distribute baked goods throughout Indiana; the IOs did not purchase the right to distribute products and possessed no ownership interest in their routes.  (GWBD's SOMF at 3; citing Tomaszewski Aff., ¶ 5, Def. Exhibit A.)

In 2004, GWBD decided to sell "equity" distribution rights in Indiana, apparently as it had done in certain other states.  (GWBD's SOMF at 3; citing Tomaszewski Aff., ¶ 6.)  In October of that year, GWBD extended an opportunity to Plaintiffs to purchase designated Sales Areas from GWBD as franchises, the cost of which would be financed through a GWBD affiliate, Glenhuron Bank.  Pls.' Resp. at 8.  Plaintiffs were informed by GWBD shortly before a GWBD-imposed deadline for signing the applicable franchise

---

[4]  The only exception is Ron Wilson who had worked for Best Foods and GWBD in Florida.  Mr. Wilson moved to Indianapolis in 2003 and began working for other GWBD IOs when they were on vacation or sick.  (Pls.' Resp. at 7, citing Dkt. 54, Ex. E ("R. Wilson Aff."), ¶3.)

agreements that, if they did not purchase the equity sales areas, they would no longer

have distributorships with GWBD.  Pls.' Resp. at 9.

Plaintiffs contend that certain of the independent operators learned of the

geographical boundaries of their designated sales areas only at the time they signed the

GWBD agreements to become franchisees of GWBD vesting in them the exclusive right

to deliver GWBD products within the defined sales areas.  (Pls.' Resp. at 9, citing Dkt.

52, Ex. R. Wilson Aff. ¶ 5; Ex. D, Deposition of Linda Brown ("Brown Dep."), p. 36; Ex.

N, Deposition of Jerry Bailey ("Bailey Dep."), p. 82, Ex. 2; Bilello Dep., Ex. 2 ("Zorman

Aff."), ¶¶ 15-16.)  One of the results of entering into these agreements was to place the

franchisees in territories where they had not previously worked.  (Dkt. 75, Amended

Complaint, ¶9.)  At the time Plaintiffs signed the GWBD agreements, their status as

independent contractors remained unchanged; however, their workloads increased

because all franchisees were now required to deliver cake and bread; (previously most

routes were either cake or bread.)  (Pls.' Resp. at 8, citing Ex. T, Affidavit of Stephen

Tetrick ("Tetrick Aff."), ¶5.)

GWBD maintains that one of its main purposes in offering the IOs an equity

interest in defined, designated geographic territories ("Sales Area") was to increase sales

by increasing the IOs' entrepreneurial motivation – in other words, hopefully, ownership

of the routes and the customer relationships would make the IOs more responsive to the

needs of the retail outlets that they served.  Because the IOs would, in effect, own their

businesses, presumably they would work harder to maintain relationships with the retail

outlets and to grow their businesses.  Also, by offering the IOs equity in defined Sales

Areas, each of them would have the opportunity to service any new stores that opened in

his or her territory.  (GWBD's SOMF at 3; citing Tomaszewski Aff., ¶ 7.)  Weston

expected to receive approximately $3.5 million from the sale of the franchises to the IOs.

(Pls.' Resp. at 10, citing Zorman Dep. pp. 150-151.)

**B.      GWBD's Franchise Offering**

        The process leading up to the sale of these equity rights included three group

meetings conducted by GWBD with prospective purchasers as well as a closing dinner.

All the meetings occurred in 2004–on September 15, September 22, and October 6; the

closing dinner occurred on October 9.  (GWBD's SOMF at 4; citing Tomaszewski Aff., ¶

8, see also Pls.' Resp. at 8.)

        At the first meeting, on September 15, 2004, presentations were made relating to

the loans and interest rates, insurance, and truck leasing.  (GWBD's SOMF at 4; citing R.

Wilson Dep., Vol. 1, 13:8 – 16:13, Def. Exhibit C.)  Plaintiffs were informed that the

"spread" in their territories would be 19 %.  (GWBD's SOMF at 4; citing Tomaszewski

Dep. 42:11-21.)  "Spread" is a reference to the difference between the discounted

wholesale price the distributors were required to pay to purchase the bread and the price

at which they could re-sell the bread to retailers.  The spread (19%) represents, in other

words, the distributors' commission rate.  In practice, Plaintiffs receive this 19% by virtue

of a discount from GWBD's suggested wholesale price.  For example, if the suggested

wholesale price of a loaf of Brownberry bread to a chain store customer (i.e., Marsh) is

6

$2.00, the Plaintiffs will purchase the loaf of bread at a 19% discount ($1.62) and sell it to (i.e., Marsh) for $2.00.  (GWBD's SOMF at 8, Tomaszewski Aff., ¶ 17.)

GWBD provided a Uniform Franchise Offering Circular ("UFOC") to each of the Plaintiffs.  (GWBD's SOMF at 4; citing Dkt. 75, Pls.' Am. Compl. ¶ 11; Dkt. 78, Ex. A (UFOC).)  The effective date of the UFOC was September 13, 2004.  Among other things, the UFOC set forth the information regarding the respective obligations of GWBD and the franchisees; the availability of financing arranged by GWBD; sample agreements including the Distribution Agreement and Financing Documents; and an operating pro forma.  (GWBD's SOMF at 4; citing UFOC, pp. 1, 26-32, Ex. B., Ex. C, Ex. N.)  GWBD contends that each Plaintiff was given the opportunity to review the UFOC, request additional information as needed, and consult with business and legal advisors regarding the franchise offering.  (GWBD's SOMF at 4; citing Tomaszewski Aff., ¶ 10).

The operating pro forma incorporated the 19% spread provision.  (GWBD's SOMF at 4; citing UFOC, Ex. N).  Item 19 of the UFOC contained the following disclaimers.  (Id. at 39):

> Actual results and any profits vary from sales area to sales area, and GWBD cannot estimate or guarantee the results and profits of any particular franchise. . . .THE PRO FORMA IS ATTACHED . . . FOR PURPOSES OF ILLUSTRATION ONLY AND SOLELY FOR THE PURPOSE OF EDUCATING YOU ON INCOME AND EXPENSE CATEGORIES TO CONSIDER IN THE OPERATION OF YOUR FRANCHISE AND FOR NO OTHER PURPOSE. YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE RESULTS SHOWN IN EXHIBIT M [sic. N] AND MAY BE LESS.

The pro forma section of the UFOC also contained the following disclaimers:

> ALTHOUGH GWBD MAY ALSO PROVIDE YOU WITH
> MORE SPECIFIC FINANCIAL INFORMATION FOR THE
> SPECIFIC SALES AREA TO BE COVERED BY THE
> FRANCHISE YOU ARE CONSIDERING, GWBD DOES
> NOT ATTEMPT TO PROJECT ANY SPECIFIC
> EARNINGS FOR YOUR DISTRIBUTORSHIP . . . .  NO
> REPRESENTATION CAN BE MADE THAT THESE
> FIGURES WILL CORRESPOND TO FIGURES FOR
> YOUR DISTRIBUTORSHIP . . . . THESE FIGURES ARE
> ONLY AN ESTIMATE OF WHAT WE THINK IS THE
> PERFORMANCE OF AN AVERAGE DISTRIBUTORSHIP.
> THERE IS NO ASSURANCE THAT YOU WILL DO AS
> WELL . . . . GWBD DOES NOT GUARANTEE ANY
> EARNINGS WHATSOEVER FOR YOUR
> DISTRIBUTORSHIP.

(UFOC, Ex. N, p. 223 of Exhibit sections.)

At the second meeting conducted one week later, on September 22, 2004, GWBD laid out the Sales Areas available for purchase by the IOs and the price for each Sales Area.  (GWBD's SOMF at 5, citing Pls.' Am. Compl. ¶ 14; R. Wilson Dep., Vol. 1, 18:1-11; P. Ray Dep. 20:12-16, Def. Exhibit D.)  The price of each Sales Area was based on the computed historic 52-week average net weekly sales for the retail outlets in that territory.  Once the 52-week average sales figure was determined, that number was multiplied by 13.  (GWBD's SOMF at 6, citing Tomaszewski Dep. 104:5-11; see also Pls.' Resp. at 10.)  Plaintiffs maintain that during this meeting Weston Management represented to them that the IO's new sales areas would be in proximity to where they lived, (Pls.' Resp. at 3, 8, citing R. Wilson Aff., ¶ 5.), that they would be allowed to manage their own businesses, (Pls.' Resp. at 9, citing R. Wilson Aff. ¶ 6), that Weston

would not "plus up" their orders (a reference to GWBD adding unwanted, unrequested product to the IO's disposable stock inventory) (R. Wilson Aff. ¶6; P.I. Tr. pp. 17-19.), and that the franchisees would have retirement equity similar to a 401K account.  (R. Wilson Aff. ¶7; Ex. S, Deposition of Jeffrey Zorman ("Zorman Dep."), p. 138 L.6-18.)

GWBD maintains that it attempted to design the new routes so that each route would have average net weekly sales of between $6,000 and $9,000 based on the preceding 52-week period, with an average route having experienced historic sales of approximately $6,700.  (GWBD's SOMF at 6, citing Tomaszewski Dep. 91:19 - 92:6.) Plaintiffs confirm that they were informed that the average weekly wholesale sales would range from $6,500 to $9,000, but that they were allowed no input in the specific sales areas available for purchase.  (Pls.' Resp. at 8-9, citing Tetrick Aff. ¶ 13; Zorman Dep. pp. 128-129; Ex. C, Transcript of Preliminary Injunction Hearing June 7, 2006 ("P.I. Tr."), p. 70.)

Each of the IOs was allowed an "insider discount" from the purchase price of the franchise, based on their number of years of prior distribution of GWBD products in Indiana.  This discount was calculated on the basis of $5,000 for the first year plus $500 for each additional year of distribution.  (GWBD's SOMF at 6, citing Tomaszewski Dep. 97:4 - 98:3.)  All of the Plaintiffs received an insider discount, with the exception of Ronald Wilson, who was not an IO prior to the sales of these franchises.  (GWBD's SOMF at 6, citing Tomaszewski Aff., ¶ 12.)  For example, the route purchased by Plaintiff Mark Casey had a 52-week average of $7,632.  By multiplying that amount by

13, the purchase price of $99,216 was reached.  Casey, however, received an insider discount of $15,500 (based on his 22 year history of distribution).  As a result, he paid a total of $83,716 for his route.  (GWBD's SOMF at 6, citing Tomaszewski Aff., ¶ 13.)

Plaintiffs allege that GWBD's management told them that GWBD would cover the costs of financing by increasing their 19% commission rate by 2%, establishing a total commission rate of 21%.  (Pls.' Resp. at 9, citing Zorman Dep. p. 135 l. 4-7; Zorman Dep. p. 134.)  However, shortly before the deadline for signing the franchise agreements, Plaintiffs were informed that there would be no increase in their commissions rate to offset the financing costs.  (Pls.' Resp. at 9, citing P.I. Tr., p. 60.)

Each Plaintiff was offered an opportunity to borrow 95% of the net purchase price from Glenhuron Bank, and each apparently took advantage of that offer.  Each of these loans was for a term of ten (10) years, at an interest rate of 7.1% (seven Plaintiffs) or 9.1% (three Plaintiffs), depending on the bank's review of their respective credit ratings.  (GWBD's SOMF at 6, citing Tomaszewski Aff., ¶ 13.)  For those who needed to finance the (5%) down payment, Distribution Services of America, Inc., (DSA) provided financing at 12.5% per annum.  (Pls.' Resp. at 10, citing Tetrick Aff. ¶ 8.)  Plaintiffs represent that they were not allowed sufficient time to obtain financing for the franchise purchases from a bank other than GWBD-owned Glenhuron Bank. (Pls.' Resp. at 10, citing Ex. B, Affidavit of Cathy Courtney ("Courtney Aff."), ¶¶ 3, 4, 5.)

## C.  The Distribution Agreement and Other Closing Documents.

The closing dinner took place on October 9, 2004, slightly more than three (3)

weeks following the initial offer meeting.  By this time, all the Plaintiffs had been

informed of their Sales Areas and all the Plaintiffs understood that their stores' spreads

would be 19%.  (GWBD's SOMF at 7, citing Tomaszewski Aff., ¶ 15.)  At the closing,

each Plaintiff executed a Distribution Agreement, effective October 11, 2004, together

with a number of other agreements, including a buy-back agreement, advertising

agreements, and financing agreements.  (GWBD's SOMF at 7, citing Tomaszewski Aff.,

¶ 16.)

Under the buy-back agreement, Plaintiffs had the "absolute right" to resell their

distribution rights to GWBD at any time within six (6) months of the effective date of the

agreement (October 11, 2004) at the original purchase price.  (GWBD's SOMF at 7,

citing Dkt. 1, Ex. B.)  However, none of the Plaintiffs exercised their right to sell back

their distributorship to GWBD within the six (6) month buy-back period.  (GWBD's

SOMF at 9, citing Tomaszewski Aff., ¶ 18.)

The Distribution Agreement also contains an integration clause which states:

> This Agreement, together with the Bill of Sale referred to in §
> 11.3 above, and any other agreements executed between the
> parties on even date herewith, sets forth the entire agreement
> between the parties and supersedes all prior agreements,
> discussions, negotiations, understandings, representations,
> conditions, warranties and covenants between them with
> respect to this subject matter.  Unless set forth herein, neither
> party shall be liable for any representation made to the other.

(GWBD's SOMF at 7, citing Dkt. 1, Ex. A1, § 11.4).

In each franchise bill of sale executed by GWBD, the individual Plaintiff acquired an exclusive right to sell and distribute certain products (sold under the names and trademarks of Brownberry, Entenmanns, Thomas' and Boboli) in a specifically defined Sales Area. The Distribution Agreements also represented that each Plaintiff had become the owner of the Distribution Rights in his or her Sales Area. (GWBD's SOMF at 7, citing Dkt. 1, Ex. A1, §§ 1.1, 1.3, 1.4.)

The Distribution Agreements required that the Plaintiffs,

> develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products, cooperating with GWBD or its affiliates in its marketing programs . . . and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.

(GWBD's SOMF at 8, citing Dkt. 1, Ex. A1, § 4.1.)

Section 3.3 of the Distribution Agreement provides: "Products will be sold to DISTRIBUTOR on terms and prices established by GWBD from time to time." (GWBD's SOMF at 8, Dkt. 1, Ex. A1, § 3.3.)

Section 2.3 of the Distribution Agreement provides, in part, that "it is the essence of this Agreement that DISTRIBUTOR be an independent contractor for all purposes . . . ," and that "[a]s an independent contractor, DISTRIBUTOR has the right to operate the business as DISTRIBUTOR chooses, and shall bear all risks and costs of operating such business." GWBD's SOMF at 8.

**D.      The Distribution Agreement's Breach Provisions**

Section 8.1 of the Distribution Agreement provides, in applicable part, that "[i]n the event of DISTRIBUTOR'S breach of any obligations or covenants under this or any other Agreement with GWBD, GWBD may terminate the Agreement as set forth below." (GWBD's SOMF at 9.)

Sections 8.2 and 8.3 of the Distribution Agreement regarding non-curable and curable breaches provide as follows:

> § 8.2 NON-CURABLE BREACH:   If the breach by DISTRIBUTOR involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to GWBD, its affiliates, it[s] operations, its trademarks or commercial reputation, GWBD may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure.

> § 8.2 CURABLE BREACH:   In the event of breach by DISTRIBUTOR other than under §8.2, GWBD shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach.  If DISTRIBUTOR fails to cure such breach within said three (3) day period, GWBD may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree that repeated violations constitute a chronic breach and threaten significant harm to GWBD, its operations, its trademarks or commercial reputation, and in such event GWBD shall be entitled to terminate this Agreement pursuant to §8.2 and DISTRIBUTOR shall have no further right to cure.

> (GWBD's SOMF at 9.)

Seven "breach" letters were sent to Steve Tetrick, one of which omitted an inspection date.  Resp. at 15.  Of the six breach letters that included inspection dates, the

13

average time span between the detection of the alleged breach and the date on the

"breach" letter was 8.3 days.  Five of the "breach" letters reported inspections that had

occurred on weekends, Mondays or, on one occasion, the day before the funeral of Mr.

Tetrick's mother-in-law (Tetrick Aff. ¶ 20).  Prior to his termination, Ron Wilson

received eight "breach" letters.  Of the eight "breach" letters sent to Wilson, five involved

inspections on Mondays or a holiday (July 5, 2005).  (Carrel Affidavit, April – 2007,

Exhibit A.)  The significance of the days/times of inspections lies in the fact that

inventories predictably fall below acceptable levels in the retail stores when the IOs are

not available to service them and lower than acceptable inventory levels is a basis for

GWBD to assert a claimed breach of the Agreement.

**E.    "Plussing Up"**

　　　　"Plussing up" refers to GWBD's unilateral additions to the amount of product

accepted for distribution by an IO.  Section 3.2 of the Distribution Agreement provides, in

part, that:

> GWBD and DISTRIBUTOR recognize that cuts and pluses
> and, on rare occasions, cancellations of deliveries, in whole or
> in part, are an unavoidable aspect of fresh baked goods
> production.  In the event of such pluses, DISTRIBUTOR
> agrees to use DISTRIBUTOR'S reasonable efforts to effect
> the sale of the additional product.

> (GWBD's SOMF at 8.)

　　　　Although GWBD represents that it is not GWBD's policy to "plus up" orders, on a

few occasions GWBD managers, contrary to GWBD's announced intentions, did increase

Plaintiffs' orders without obtaining the distributors' consent.  (Pls.' Resp. at 12, citing Carrel Aff. 3-15-06, ¶ 4, 9, 10; R. Wilson Dep. I, pp. 52-56;  .  (GWBD's SOMF at 9, citing Tomaszewski Aff., ¶ 19.)  Ordinarily, if a Plaintiff does not order product, he or she is under no obligation to take it.  (GWBD's SOMF at 9, citing P. Ray Dep. 48:10-12.)

On occasion, GWBD also unilaterally reduced the amount of product ordered by distributors.  (Pls.' Resp. at 12, citing Carrel Aff. 3-15-06 ¶ 6; R. Wilson Dep. I, pp 60-62.)  For example, Plaintiffs contend that Mr. Wilson's franchise agreement was terminated because one product, Louisiana Crunch Cake, after being found to be out of stock, actually resulted from Weston's cuts in inventory.  (Pls.' Resp. at 12, citing Dkt. 54, Ex. F ("R. Wilson Supp. Aff."), ¶ 9.)

## F.    The Pallet Program

Section 5.2 of the Distribution Agreement authorizes GWBD to act as the IO's agent with respect to negotiations with chain stores, such as the Kroger and Marsh grocery stores.  (GWBD's SOMF at 10, citing Dkt. 1, Ex. A1, § 5.2.)  As agent for the IOs, GWBD negotiates for the delivery of pallets of specific products directly to the large chain stores on behalf of the IOs.  (GWBD's SOMF at 10, citing Tomaszewski Aff., ¶ 20.)  Even though the IOs are not responsible for the delivery of the product on pallets, they nonetheless receive credit for all sales within their Sales Areas.  (GWBD's SOMF at 10, citing Tomaszewski Aff., ¶ 21.)  In the event a pallet product does not sell, the IOs are required to return the product to GWBD for full credit.  (GWBD's SOMF at 10, citing Tomaszewski Aff., ¶ 21.)

15

**G.      Alleged Emotional Distress[5]**

Plaintiffs assert that Brian Short ("Short"), GWBD's District Sales Manager, was a difficult and generally unsatisfactory supervisor for GWBD and that, despite being involved in numerous incidents involving threats, terminations and coercive behavior towards various distributors, he was never disciplined by GWBD for such behaviors. (Response at 15, citing Billelo Dep., p. 162, ll. 7-12.)  Plaintiffs maintain that Larry Billelo, the Regional Vice President of Sales for GWBD, knew of these allegations of harassment on the part of Mr. Short immediately after the filing of this suit and still took no steps to reprimand him.  In fact, in the spring of 2006, GWBD promoted Short to an account executive position and allowed him to relocate to Cincinnati.  (Response at 15, citing Billelo Dep., p. 162, ll. 20-22; p 163, l. 1.)  Mr. Billelo responds by representing that he would never approve of any of his employees shouting at or intimidating distributors or acting towards them in a threatening manner and that, if he had known that such conduct was occurring by Short or anyone else, he would have taken steps to halt it. (Billelo Dep., p. 182.)  Mr. Billelo agreed with Plaintiffs that it was entirely inappropriate

---

[5]  In support of their claims of emotional distress, Plaintiffs offer the testimony of their treating physicians.  On May 8, 2007, Defendant filed a Motion to Exclude or Limit Testimony of Plaintiffs' Damages Expert and Plaintiffs' Treating Physicians.  Docket No. 145.  As explained below, we GRANT Defendant's motion for summary judgment on Plaintiffs' claims for intentional infliction of emotional distress.  Therefore, the Court need not determine the admissibility of Plaintiffs' expert witnesses' testimony.  Accordingly, we DENY Defendants' Motion as MOOT.  At this time, we also DENY as MOOT Defendant's motion to limit the testimony of Plaintiffs' damages expert.  Expert damages testimony is not necessary at this stage of these proceedings, which renders this motion premature.  Defendant is not precluded from refiling this motion at a later date, if necessary.

for a District Sales Manager to shout at a distributor while they were inside a retail store. (Billelo Dep., p. 190.)

1.      **Distributor-plaintiffs Ron and Patti Clouse**:

Ron and Patti Clouse initially signed interrogatory answers stating that neither of them was asserting a claim for emotional distress; however, both later changed their minds and now are asserting this claim for which they seek damages.  SOMF at 10, citing R. Clouse Dep. 63:23 – 64:3, Def. Exhibit F, P. Clouse Dep. 114:14-24, Def. Exhibit G.)

The facts adduced reveal that one morning in 2005, District Sales Manager Short allegedly followed Patti Clouse around the Indianapolis depot as she was loading her truck, repeatedly accusing her of improperly taking GWBD product that had been set out for another distributor.  Short continued shouting at Patti Close even after she entered her truck to drive away.  (Response at 17, citing P. Clouse Dep. pp. 82 l. 3 to 85 l. 25).  On another occasion, Short allegedly told Patti Close, as she serviced one of her stores, that whether or not the product was selling in the stores, if she didn't carry the entire Weston product line, he would "just have to terminate [her] route."  (Response at 17, citing P. Clouse Dep. 95:2 - 96:18).  Short's remarks and behavior were made all the more inappropriate because he wasn't the actual, direct supervisor of Patti Clouse; Patti Clouse's District Sales Manager at that time was Jerry Bailey.  (P. Clouse Dep. p. 83).

2.      **Distributor-plaintiffs Pete and Joyce Ray:**

Pete Ray and Joyce Ray both claim to have developed "high blood pressure due to Weston's conduct."  (GWBD's SOMF at 10, citing Pete Ray and Joyce Ray, Answers to

Interrog. No. 17, Def. Exhibits H and I.)  However, their common aliment is not attributed to any particular event and their emotional distress claim has not been developed in the Response brief.  However, Joyce Ray does allege that she was specifically targeted for adverse treatment resulting in emotional distress because her franchise purchase price included a Sam's store on 96th Street that had previously experienced $2000 in weekly wholesale sales on Thomas Bagels, though GWBD knew at the time she purchased the distributorship that the Sam's store was going to stop purchasing Thomas bagels from Weston and GWBD did not disclose this information to her at the time she purchased her franchise.  (Pls.' Resp. at 11, citing Ex. F, Deposition of Joyce Ray ("J. Ray Dep."), p. 39; P.I. Tr. p. 3, ll. 1-12.)

### 3.     Joe Carrel

Joe Carrel alleges that he suffered high blood pressure due to Weston's conduct but admits his blood pressure has gone down since Short was transferred in the spring of 2006.  (GWBD's SOMF at 11, citing Joe Carrel, Answer to Interrog. No. 17, Def. Exhibit J.)

### 4.     Cathy Courtney

In August of 2005, Ron Wilson observed District Sales Manager Short yelling loudly at distributor, Cathy Courtney, at the warehouse.  Resp. at 10.  He also observed Short as he followed Cathy Courtney around while she was trying to load her trailer and continued yelling at her in the same way in which Short allegedly harassed Ms. Clouse.  Cathy Courtney was brought to tears by this abuse, according to Mr. Wilson.  Later, Ron

Wilson confronted Short to tell him that he shouldn't be yelling at Cathy Courtney and Short told Wilson that it was "none of (Wilson's) business."  (Affidavit of Ron Wilson, ¶ 23.)

Cathy Courtney testified that Mr. Short harassed her every working day regarding every detail of her route operation. (Courtney Dep., p. 49).  For example, she testified, Short would scream at her in front of customers and, on one occasion, did so in the presence of a store manager.  (Resp. at 12, citing Courtney Dep., p. 46, ll. 10-21, p. 47, ll. 21-23.)  Another time at the GWBD distribution center Mr. Short allegedly followed Ms. Courtney "all over the depot, yelling and screaming at [her] about [her] sorting out my load, and about this—something about bagels, . . . and just on and on, screaming again." (Courtney Dep., p. 52- 53.)  She testified: "I was embarrassed because I didn't want my boss sitting here yelling and screaming at me, especially in front of all of these people [at the depot] well, yelling and screaming at me.  It's just not right."  (Courtney Dep., 53.) Cathy Courtney asserts that she developed headaches as a result of Mr. Short's behavior.

### 5.    Ron Wilson

Ron Wilson contends that District Sales Manager Short conducted a pattern of coercion, harassment and threats to terminate Wilson's franchise, i.e., calling Mr. Wilson to see if he had received his "latest write-up," which Mr. Wilson viewed as harassment since he had not yet received it.  Response at 11.  In response to a "breach" letter, Mr. Wilson had to enlist a LoBill store manager to confirm to Short that Mr. Wilson had not removed a display, as had been alleged in the "breach" letter, but rather that he, the store

manager, had removed the display.  Response at 16.  Even then, Short refused to confirm with the store manager what had occurred and allowed the erroneous "breach" letter to stand.  (R. Wilson Supp. Aff. ¶ 5).  In January 2005 at the O'Malia's grocery store located in downtown Indianapolis, Mr. Short openly threatened to terminate Mr. Wilson, saying, "You're out of here." (R. Wilson Supp. Aff. ¶ 4.)

On February 23, 2007, five days before Mr. Wilson's franchise agreement was terminated by GWBD management, Mr. Short was at the depot at 3:30 a.m. during the time Ron Wilson was loading his trailer.  Response at 11.  Mr. Wilson asked Mr. Short why he had approved cutting his order for cake which product had sold well in Mr. Wilson's sales area.  Mr. Short responded in typical fashion with excessive displays of anger, yelling and screaming, moving to within inches of Mr. Wilson's face, all occurring in the presence of other Weston franchisees.  Mr. Wilson became upset in response to Mr. Short's abuse and reportedly could feel his blood pressure rising.  (R. Wilson Supp. Aff. ¶ 6 and 7).  Patti Clouse testified to having heard Short say about Ron Wilson, "He's an asshole. I'm going to call him every day; I'm going to harass him. Watch this---I'm going to go over and check his stale. I'll get him fired up."  Ms. Clouse also testified that she was present and heard Mr. Short accuse Mr. Wilson of trying to cheat him; that upon hearing this, Mr. Wilson's face became red; and that Mr. Short proceeded to follow Mr. Wilson around for several minutes as further intimidation and harassment of him. (Response at 11, citing P. Clouse Aff. ¶ 4,5 and 6; R. Wilson Supp. Aff. ¶10).

On February 28, 2006, Ron Wilson's franchise was terminated.  GWBD's SOMF at 11, (R. Wilson Supp. Aff. ¶ 8).  GWBD contends that, prior to that time, it had received numerous customer complaints about Wilson's service and that, as a result, GWBD had to issue seven (7) "breach" letters to Wilson, beginning April 14, 2005, and continuing thereafter.  (GWBD's SOMF at 11, citing Tomaszewski Aff., ¶ 23).

### 6.   Steve Tetrick

Mr. Tetrick complains that he was assigned a new equity route which required him to drive 750 to 800 miles each week (Weston represents that the route actually covered only 627 miles) and that the route generated only $5,882 in average weekly sales.  Response at 12.  The new equity sales area included Plainfield, Greencastle, Cloverdale and Danville and consisted of a total of nine stops.  Prior to signing his Franchise Agreement, Mr. Tetrick had told Regional Sales Manager Larry Billelo and District Sales Manager Jeff Zorman that the sales area they were assigning him included too many miles and that he didn't see any way that it would work.  "Larry Billelo and Jeff Zorman said they knew how difficult the sales area would be, but they wanted me to take the sales area and I told them that I would.  They indicated that they would help me out if I was in trouble."  (Response at 13, citing Tetrick Affidavit, ¶ 9.)  Tetrick testified that, at the time he signed the contract, he had said to GWBD's representatives, Larry Billelo and Jeff Zorman, "that's going to be almost impossible to run that route and service these stops properly,"  (Tetrick Dep., p. 38, ll. 16-17), but he felt he had no other option.  (Tetrick Dep., p. 41.)  A major inducement to Steve Tetrick in purchasing this franchise, according

to him, was the fact that a Super Wal-Mart was being constructed in the fall of 2004 in Plainfield which was within his sales area.  (Response at 13, citing Tetrick Aff. ¶29.)

Steve Tetrick testified that, due to the predicted difficulty in operating such an expansive route, he attempted to sell off the west end of his territory to one Paul Finch. (Response at 13, citing Tetrick Dep. p. 67.)  Mr. Finch had agreed to buy that portion of Mr. Tetrick's route and the adjacent route belonging to Dave Siskin.  All three parties had signed a letter of intent in the presence of Mr. Short to effect that transaction, which letter was then forwarded to Bob Tomaszewski and Larry Billebo who held positions in GWBD's management.  (Tetrick Dep., p. 68; Response at 13-14, citing Tomaszewski Dep. pp. 131, Ex. 13).  However, after the submission of this letter for approval by GWBD, no decision by GWBD regarding the sale was ever communicated to Mr. Tetrick. (Response at 14, citing Tomaszewski Dep. p. 136).

Plaintiffs allege that when Mr. Tetrick was in the throes of dealing with various, serious family difficulties, Short increased the pressure and threats towards him, well knowing that so large a sales area as Tetrick was managing at that time would prevent him from being ablet to visit each store daily.  (Response at 14, citing Tetrick Aff, ¶18.)

Mr. Tetrick's Distribution Agreement was terminated on September 29, 2005. GWBD's SOMF at 11.  GWBD maintains that, prior to that time, it had received numerous customer complaints about Tetrick's service, requiring GWBD to issue a total of six (6) "breach" letters beginning March 1, 2005, and thereafter.  (GWBD's SOMF at 11, citing Tomaszewski Aff., ¶ 22).  Mr. Billelo testified that he was the official who

approved the terminations of both Steve Tetrick's and Ron Wilson's franchises.

(Response at 14, citing Billelo Dep., p. 95.)

## G.    The "Under Achievers"

Plaintiffs state that, prior to closing on the sales of the franchises, Weston had identified a list of individual distributors it deemed to be "under achievers" whom Weston planned to weed out after they had purchased their franchises.  Weston management included in this group of "under achievers" Plaintiffs Linda Brown, Pete Ray, Joyce Ray, Ron Clouse, Patti Clouse and Stephen Tetrick.  (Pls.' Resp. at 10-12, citing Zorman Tr., p. 14-15; Zorman Dep. p. 159 ll 3-24.)  These targeted distributors each had between 8 and 25 years of service delivering products for Weston and its predecessor entities.  (Pls.' Resp. at 12, citing Dkt. 75, Amended Complaint, ¶ 18).  Plaintiffs assert that GWBD intentionally assigned the difficult sales areas to distributors it planned to weed out or terminate and that Weston executed its plan to "weed out" the distributors it considered to be "under achievers" by "living on" their routes–that is to say, by focusing unrelenting attention on their performance–and by issuing "breach" letters where usually minor errors or oversights were discovered.  (Pls.' Resp. at 12, citing Zorman Dep. p. 181, l. 7-12; p. 172, l. 12-23; Zorman Aff. ¶ 20.)  In Plaintiffs' view, these distributors were set up in advance by GWBD to fail.

Part of Defendant's "weed out" plan allegedly involved conducting numerous store inspections on Sundays and Mondays by Charles Svihlik, one of Defendant's Executive Account Managers.  What made these inspections unfair was that the distributors would

be faulted for out-of-stock conditions which on the weekends was entirely to be expected. Such inspections were calculated to generate "breaches" in order to target and eventually terminate the franchises of certain of the Plaintiffs.  (Pls.' Resp. at 12-13, citing Zorman Depo., p. 167 L. 8-12.)  In addition, when alleged breaches of the Distribution Agreements occurred, GWBD often failed to allow the distributors an opportunity to cure them.  For example, the average span of time between Weston's store inspection and the issuance of the breach letters was eight days, even though when they were finally sent most of the letters were delivered by UPS overnight service. (Pls.' Resp. at 13, citing Carrel Aff. April '07, ¶ 5, Ex. A).

Weston's refusals to assist franchisees with difficult sales areas, such as Tetrick's and Wilson's, also included their failure to make what would otherwise have been customary adjustments to permit sell-offs of portions of the routes.  (Pls.' Resp. at 13, citing Tomaszewski Dep. pp. 131-135; Ex. K, Deposition of Ronald Wilson, May 23, 2006 ("R. Wilson Dep. II"), pp. 60-62; Ex. H, Deposition of Stephen Tetrick ("Tetrick Dep."), pp. 67-70.)

## H.    Promotions / Sales

Prior to the time of the sales of the franchises, Weston placed approximately 25% of its products on sale.  Starting in the fall of 2004 Weston developed a marketing plan to place on sale (promote) three times the amount of products they had previously sold, which equaled 70 to 75% of all of its products.  These sales immediately followed the six-month buy-back period (when Weston had agreed to buy back the equity sales areas

24

for what franchisees paid for them).  (Pls.' Resp. at 11, citing Ex. G, Deposition of Mark

Casey ("Casey Dep."), p. 70, l. 12-21).  Weston's inflated sales had a substantial effect on

the distributors' commissions.

One example of such a Weston-sponsored product promotion is referred to as a

"10 for 10" sale on Brownberry bread, which was sold at the price set by Westen of $1.00

per loaf.  The retail outlet paid $.85 per loaf of which the distributor received $.16.

Before this promotion, the wholesale price of a loaf of Brownberry bread was set at $2.42

and the distributor earned $.46 a loaf, that is, three times as much as the amount for sales

of such bread on promotion.  Because bread is a bulky space-consuming product, it filled

the distributors' trailers to near capacity and substantially reduced the income that had

been assured by GWBD, while at the same time significantly increasing the distributors'

costs of operation.  (Pls.' Resp. at 1-12, citing Tetrick Aff. ¶ 19; R. Wilson Aff. ¶ 25;

Casey Dep. p. 71, ll. 8-11; Ex. E, Deposition of Cathy Courtney ("Courtney Dep."), p. 29,

ll. 24-25, p. 30 ll. 1-4.)

Plaintiffs maintain that the impact of this change in pricing was that Plaintiffs had

either to work more hours to achieve and maintain the wholesale sales volumes or suffer

substantial erosion in the value of their sales area and earning potential from that

previously calculated by Weston.  (Pls.' Resp. at 12, citing R. Wilson Aff. ¶ 14; Tetrick

Aff. ¶ 12.)  Distributors were required to sell 30% more product in order to realize the

same earnings on products following their equity purchases.  (Casey Dep. p. 65, ll.

13-18.)  More specifically, Plaintiffs estimate that they were required to work 70 to 75

hours a week under the new arrangement to realize the same earnings levels.  (Pls.' Resp. at 12, citing R. Wilson Aff. ¶ 14; Tetrick Aff. ¶ 12.)

### H.    Sales by Courtney and Brown.

Plaintiff Cathy Courtney sold her distribution rights, effective April 26, 2006, for $90,948.  She had initially paid $78,025 to obtain the distribution rights in October 2004. (GWBD's SOMF at 11, citing Tomaszewski Aff., ¶ 24.)

Plaintiff Linda Brown sold her distribution rights, effective May 9, 2006, for $123,000.  In October 2004, she had paid $97,768 to acquire her distribution rights. (GWBD's SOMF at 11, citing Tomaszewski Aff., ¶ 25.)

Based on average net weekly sales for the 52-week period ending January 19, 2007, the distribution rights of Plaintiffs Joe Carrel, Mark Casey, Ron Clouse, Joyce Ray, Pete Ray, and Steve Tetrick are estimated to be more valuable now than when Plaintiffs purchased them in October 2004.  (GWBD's SOMF at 11, citing Tomaszewski Aff., ¶ 26.)

The events leading up to and surrounding October 2004 when Plaintiffs converted from being independent operators to being franchisees of GWBD have given rise to this litigation.  We turn now to Plaintiffs' legal claims based on the facts heretofore summarized.

## Legal Analysis

### I.  STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

27

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. <u>See Shields Enterprises, Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. <u>See Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

## II.    DISCUSSION

This case is before the Court pursuant to our federal question and diversity of citizenship jurisdiction. We address each of these claims below as raised in Defendant's motion for summary judgment.

### A.    INJUNCTIVE RELIEF – COUNT I

We begin with Plaintiffs' request for injunctive relief--both preliminary and permanent. See Compl. Count I. The request for a permanent injunction specifically seeks an order directing "WESTON to forever cease from its unlawful actions toward the Distributors." Compl. at ¶ 49, see also Pls.' Response at 48. In moving for partial

28

summary judgment, GWBD argues that Plaintiffs cannot satisfy any of the legal elements necessary to obtain a permanent injunction.  Def.'s Reply at 26.

The Court received briefs and heard evidence on the preliminary injunction issue at a hearing on Plaintiffs' Motion for Preliminary Injunction conducted on June 7, 2006. This hearing had to be continued until June 19, 2006, and, at the conclusion of that session, the Court granted the Parties' Joint Motion to Continue the Preliminary Injunction Hearing in order to allow the parties to attempt to negotiate a settlement. Apparently their efforts were unsuccessful because the issue is back before us once again.

"To prevail on a motion for a preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." Woods v. Buss, 2007 WL 1302119, *1 (7th Cir. 2007), quoting FoodComm Intern v. Berry, 328 F.3d 300, 303 (7th Cir. 2003) (citations omitted).  "If the moving party meets the first three requirements, then the district court balances the relative harms that could be caused to either party." Woods v. Buss, 2007 WL 1302119, *1 (7th Cir. 2007), quoting Incredible Tech., Inc. v. Virtual Tech., Inc., 400 F.3d 1007, 1011 (7th Cir. 2005)).

The conflict in this case has arisen out of the business relationship between the Distributors and GWBD based on their underlying agreements.  From the evidence adduced at the hearing, it is clear that the harms alleged by Plaintiffs can be adequately remedied by an award of money damages, which, of course, constitutes an adequate remedy at law.  Thus, we hold that a preliminary injunction is not appropriate in this case

and summary judgment in favor of GWBD on Count I of the Amended Complaint must

enter as to this claim.  We reserve a final ruling on whether Plaintiffs are entitled to a

permanent injunction until a determination is made as to the substantive merits of

Plaintiffs' claims.

### B.    THE CLAYTON ACT – COUNT II

In Count II of their Amended Complaint, Plaintiffs claim that GWBD violated the

Clayton Act, (15 U.S.C. § 15), based on its "actions [which] constitute unfair methods of

competition and unfair or deceptive acts or practices in or affecting commerce among the

several states of the United States," resulting in injury to the Distributors.  Pls.' Am.

Comp. ¶ 53-54.

The Clayton Act permits suits brought by individuals injured in their business or

property by actions prohibited under the antitrust laws.  To establish a Clayton Act

violation, a plaintiff must be able, first, to establish an antitrust injury.  Bob Nicholson

Appliance, Inc. v. Maytag Co., 883 F. Supp. 321, 324 (S.D. Ind. 1994).  An antitrust

injury is a loss that comes from acts that reduce output or raise prices to consumers.  Id.

(quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977)).  The

parties agree that a plaintiff bringing a private cause of action under the Clayton Act must

show: "(1) a duty recognized by the antitrust laws; (2) a violation of the antitrust laws; (3)

injury to an interest protected by the antitrust laws and attributable to the antitrust

violation – that is an *antitrust injury*; and (4) a direct link between the antitrust violation

and the antitrust injury, that is to say, *standing*."  Greater Rockford Energy and Tech.

30

Corp., v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir. 1993) (emphasis added).  "Anti-trust

laws," as the term is used in the Act, includes the Wilson Tariff Act, the Sherman Act,

and the Robinson-Patman Act.  15 U.S.C. §12(a).  Plaintiffs contend that they have

sufficiently alleged a factual basis to support their Clayton Act claims under both the

Sherman and the Robinson-Patman Acts.

Interestingly, neither party specifically addressed the issue of anti-trust injury or

standing in their briefings to the Court.  This is a critical omission because, as previously

noted, anti-trust injury and standing are both essential elements of claims brought under

the Clayton Act.  If anti-trust injury and standing are not established, any discussion or

analysis of the substantive requirements of the Sherman Act and/or the Robinson-Patman

Act is purely academic.  Thus, we have undertaken an analysis of these factors *sua

sponte,* without the benefit of the parties' arguments and contentions.

When antitrust standing and antitrust injury are examined at the summary

judgment stage, the Court presumes for purposes of resolving those issues that the

antitrust Plaintiff can prove an underlying antitrust violation.  See Local Beauty Supply,

Inc. v. Lamaur, Inc., 787 F.2d 1197, 1200 (7th Cir. 1986).  An antitrust plaintiff is

required to prove: (1) that he suffered a particular type of injury related to reduced

competition the antitrust laws "were intended to prevent," i.e., the plaintiff suffered

antitrust injury, and (2) that he is the proper plaintiff to bring the action, i.e., the plaintiff

has antitrust standing.  Local Beauty Supply, Inc., 787 F.2d at 1201; Serfecz v. Jewel

Food Stores, 67 F.3d 591, 597 (7th Cir. 1995).  Thus, in evaluating Distributors' ability to

prove an antitrust injury and to establish antitrust standing, we accept their antitrust-

related allegations as true.

The Seventh Circuit has held:

> [I]n order to maintain an antitrust action[,] plaintiffs must be
> able to show more than an injury linked to a violation of the
> antitrust laws; they must prove an "antitrust injury." . . .
> Antitrust injury is defined as 'injury of the type the antitrust
> laws were intended to prevent and that flows from that which
> makes defendants' acts unlawful.'

Local Beauty Supply, Inc., 787 F.2d at 1201 (quoting Brunswick Corp. v. Pueblo Bowl-

O-Mat, Inc., 429 U.S. 477 (1977))).  An antitrust injury, is a loss that "comes from acts

that reduce output or raise prices to consumers."  Bob Nicholson Appliance, Inc. v.

Maytag Co., 883 F. Supp. 321, 324 (S.D. Ind. 1994).

> The antitrust injury doctrine was created to filter out
> complaints by competitors and others who may be hurt by
> productive efficiencies, higher output, and lower prices, all of
> which the antitrust laws are designed to encourage . . . A
> plaintiff who wants something, such as less competition or
> higher prices, that would injure consumers, does not suffer
> antitrust injury.

United States Gypsum Co. v. Indiana Gas Co., 350 F.3d 623, 627 (7th Cir. 2003) (finding

antitrust injury suffered by direct consumer in market).  "Suppliers to direct market

participants typically cannot seek recovery under the antitrust laws because their injuries

are too secondary and indirect to be considered 'antitrust injuries.'"  Serfecz, 67 F.3d at

597; Stamatakis Indus. v. King, 965 F.2d 469, 471 (7th Cir. 1992) ("[A] producer's loss is

no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.")

The Distributors' theory underlying their Clayton Act allegation does not specify any alleged antitrust injury.  Distributors merely claim that GWBD discriminated in prices for product between and among them and that such discrimination favored certain Distributors over others by giving a select few a competitive advantage in the form of increased profits.  This discrimination by GWBD allegedly resulted from Weston's new promotional campaigns offering reduced prices to consumers, which in turn depressed all the Plaintiffs' revenues.  Resp. at 48.

However, this harm of "competitive disadvantage" among the Distributors does not constitute an "antitrust injury."  Such a result is not within the scope of injury that the antitrust laws are designed to remedy.  Indeed, Plaintiffs acknowledge that the consumers actually received the benefit of lower prices for GWBD product, albeit at the expense of the Distributors.  Clearly, that is not an injury resulting from acts that reduce output or raise prices to consumers.  Therefore, Plaintiffs lack standing to maintain a private antitrust claim for lack of an antitrust injury.  Local Beauty Supply, Inc., at 1201-02 (internal citations omitted).  Distributors have not suffered an antitrust injury because their claimed injuries, to wit, their internal competitive disadvantage in delivering goods to market at reduced prices set by GWBD, is not within the contemplation of the antitrust laws.  Stated otherwise, Plaintiffs have adduced no evidence that any consumer(s) in the market for baked goods was harmed by GWBD's practices.

Having determined that Plaintiffs' evidence fails to establish an antitrust injury, GWBD's motion for summary judgment on Count II of the Complaint must be GRANTED. However, because we were required to address this dispositive threshold issue *sua sponte,* we shall also address the substantive merits of each separate anti-trust claim.

### 1.   Sherman Act

Section 1 of the Sherman Act prohibits every contract, combination or conspiracy in restraint of trade. 15 U.S.C. § 1. To establish a claim under Section 1, a plaintiff must establish a contract, conspiracy or combination intended to restrain competition and which actually has an anticompetitive effect. Greater Rockford, 998 F.2d at 396.

### a.   Alleged tying arrangement

The Sherman Act prohibits tying arrangements, where the availability of one product or service is conditioned upon purchasing another product or service. Carl Sandburg Village Condominium Assoc. No. 1 v. First Condominium Development Co., 758 F.2d 203, 207 (7th Cir. 1985). Plaintiffs allege that GWBD tied the ownership of the distributorships and the financing of those distributorships together, and that GWBD also fixed the prices at which distributors were permitted to resell their franchises. GWBD contends that these claims are entirely without merit. Reply at 6.

There are four essential legal elements of a tying violation: (1) the existence of a tie between two separate products; (2) the tying seller has sufficient economic power in the tying product market to restrain free competition in the tied product market; (3) the tie

affects a not-insubstantial amount of interstate commerce in the tied product, and (4) the tying seller has some economic interest in the sales of the tied product. <u>Reifert v. South Central Wisconsin MLS Corp.</u>, 450 F.3d 312 (7th Cir. 2006), <u>cert denied</u> 127 S.Ct. 1494 (2007).

Plaintiffs' specific theory is that Plaintiffs' purchases of the franchises were tied to their obtaining credit through the GWBD-controlled Glenhuron Bank. Pls.' Resp. at 56. Plaintiffs argue that the franchises and the financing are separate and distinct products or services and that, in tying them to one another, GWBD violated the Sherman anti-tying provisions. Defendants rejoin that there is absolutely no evidence that the franchise agreements were in any way tied to the purchases of their franchises; in fact, all the evidence indicates that financing was merely offered by Glenhuron Bank but not required. Defs.' Reply at 6-7. Plaintiffs acknowledge that the financing was purportedly "optional," but contend that they were not given a meaningful opportunity to locate or arrange alternative financing. (Courtney Aff., ¶¶5-8.)

In support of their argument, Plaintiffs point out that GWBD's first presentation to the Distributors relating to the sales of franchises occurred on September 15, 2004, and the closings occurred a mere twenty-four (24) days later, on October 9, 2004. (Tomaszewski Aff., ¶8.) The first presentation focused on general loan information, but no details were provided regarding the specific routes that would be offered for sale to the Distributors. (R. Wilson Dep. I, p. 14, l. 3 to p. 17, l. 17.) In fact, Weston did not distribute the information regarding the actual routes and the related values of the routes

being offered to the individual Distributors until September 22, 2004.  (R. Wilson Dep. I, p. 18, l. 1 -11; Ex. V, Deposition of Peter Ray ("P. Ray Dep."), p. 20 l. 12-16; Courtney Aff., ¶3.)  Plaintiffs contend, in any event, that seventeen days was not sufficient time to allow them to find alternate financing for the franchises and therefore they in effect had no choice other than to contract with the Glenhuron Bank.  (Courtney Aff. ¶7).

GWBD replies that, despite this admittedly limited time frame, there is no evidence that GWBD refused to sell the franchises unless Plaintiffs agreed to finance their purchases through Glenhuron Bank.  Reply at 7.  GWBD argues that the Plaintiffs were entirely free to seek financing elsewhere or to purchase their franchises with cash.  (Id., citing Docket No. 78, Ex. A, UFOC, pp. 28-30.)

Based on the evidence before the Court, it is clear to us that the sale of the franchises was in fact not tied by GWBD to financing provided through Glenhuron Bank.  The Sherman Act prohibits only the conditioning of a purchase of a product upon the purchase of another product or service.  See Carl Sandburg Village Condominium Assoc. No. 1, 758 F.2d at 207.  There is no evidence that such tying occurred here.  We accept that it may have been difficult for individual distributors to locate alternative financing for their purchases within the allotted seventeen days, but no evidence exists to show that it would have been impossible or that, if the Plaintiffs had been able or willing to pay for the routes in cash, GWBD would have rejected their offers.  Thus, Plaintiffs have not adduced evidence to establish a tying violation under the Sherman Act and Defendants' motion for summary judgment on this alternative ground is GRANTED.

b.    **The alleged price fixing**

Plaintiffs also claim that GWBD violated Section 1 of the Sherman Act by fixing

the price at which a Distributor was permitted to re-sell his or her franchise.  According to

the Distributors, the evidence discloses that when Plaintiff Carrel was negotiating with

Plaintiffs Wilson and Brown to purchase portions of each of the routes belonging to the

latter two distributors, (Resp. at 46 ) in discussing their plan with GWBD management,

Mr. Carrel was informed of a $150,000 limit on the amount Glenhuron Bank would lend.

(Id. at 46-47, citing Carrel Dep. p. 14, l. 14 to p. 15, l. 8).  In addition, when Plaintiff

Courtney sought to sell her route, the would-be buyer had agreed to a price higher than

the 13-to-1 price ratio at which Courtney had originally purchased the route from GWBD.

Resp. at 47.  However, the Glenhuron Bank refused to finance the sale/purchase for more

than the 13-to-1 ratio, forcing Ms. Courtney to sell her route at a lower price, that is, a

price that equaled the 13-to-1 ratio.  (Id., citing Courtney Dep., p. 69 l.18-23; p. 73 l. 9 to

p. 74, l. 6).

GWBD responds that Plaintiffs have failed to produce evidence that "a

combination was formed for the purpose of fixing prices and that it caused them to be

fixed . . . ." Tri-Gen Inc. v. International Union of Operating Engineers, 433 F.3d 1024,

1032-33 (7th Cir. 2006).  Without evidence establishing such an illegal combination or

conspiracy, Plaintiffs' claims fail.  Reply at 9.  GWBD asserts that Glenhuron simply set

the terms pursuant to which it was willing to loan money and that evidence of its

otherwise entirely legal activity does not support an inference of an illegal conspiracy to

fix prices.  Id., citing Miles Distribs. v. Specialty Const. Brands, Inc., 476 F.3d 442 (7th Cir. 2002).  GWBD notes that the franchises could have been purchased for the amounts the parties agreed upon, if Mr. Carrel and Ms. Courtney's buyer were able and willing to pay cash for the purchases or if alternative financing had been arranged.  Reply at 9.

The evidence adduced here is insufficient to support Plaintiffs' claims of price fixing.  There is no evidence of a conspiracy formed for the purpose of fixing prices. From all we can deduce from the evidence presented, the bank determined the limit as to the amount(s) it was willing to finance regarding the purchases of the Distributors' routes and, if the Distributors and their buyers reached an agreement in excess of this limit, they were free to secure financing through other lenders.  Therefore, GWBD's motion for summary judgment is GRANTED as to the price fixing claim under the Sherman Act.

2.      **Robinson-Patman Act**

The Robinson-Patman Act was enacted to protect small local businesses who are in competition with large, interstate businesses.  Standard Oil Co. v. Fed. Trade Comm'n, 340 U.S. 231, 236 (1950).  The Robinson-Patman Act prohibits sellers from discriminating in price between at least two purchasers of goods of like grade and quality where the effect may be to substantially lessen competition or tend to create a monopoly. To establish such a violation, Plaintiffs must be able to show that (1) the sales were made in interstate commerce; (2) the goods purchased were of like grade and quality; (3) the Defendant discriminated in price between the Plaintiffs and another purchaser; and (4) the effect of the discrimination may be to injure, destroy, or prevent competition to the

advantage of the favored purchaser.  <u>Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.</u>, 126 S. Ct. 860, 870 (2006).

In <u>Volvo</u>, the U.S. Supreme Court ruled that, to prevail on a discrimination claim under the Robinson-Patman Act, a plaintiff must demonstrate that the defendant discriminated between purchasers competing to resell its product to the same retail customer.  <u>Id.</u> at 869. The plaintiff in <u>Volvo</u> was a franchisee of the Volvo automobile manufacturing company and the exclusive dealer in a particular territory.  As a result, he competed almost exclusively with non-Volvo dealers.  Plaintiff argued that other Volvo franchisees received better discounts on the cost of new trucks than the franchisee was getting.  The Court held that, absent actual competition with a favored Volvo dealer, the plaintiff could not establish the kind of competitive injury required under the Act.  <u>Id.</u> at 870.

The facts in <u>Volvo</u> are very similar to the facts in the case at bar.  Here, Plaintiffs each possessed an exclusive right to distribute GWBD products to retail outlets located in their individual Sales Areas.  (Distribution Agreement, § 1.4).  As a result, Plaintiffs do not compete with other GWBD distributors for their direct customers.  This factual distinction is critical because Plaintiffs cannot demonstrate the required competition that is an essential element of a Robinson-Patman Act claim.  Accordingly, their Clayton Act claim fails as well.

In summary, GWBD's Motion for Summary Judgment on Count II is <u>GRANTED</u>. Plaintiffs have failed to demonstrate that they have suffered an anti-trust injury.  In

addition, Plaintiffs lack sufficient evidence to support a claim under either the Sherman

Act or the Robinson-Patman Act, making summary judgment proper on all these grounds.

### C.    INDIANA FRANCHISE DISCLOSURE ACT – COUNT III

The Distributors allege that GWBD offered and sold the franchises at issue here in

violation of the antifraud provision of the Indiana Franchise Disclosure Act,  Indiana

Code § 23-2-2.5-1 *et seq.* (the "Indiana Franchise Act" or "IFDA").  See Amended

Compl. ¶¶ 61-64.  These charges of franchise fraud stem from alleged misrepresentations

and omissions in connection with the sale of the Distributors' Sales Areas.  The

Distributors provide a laundry list of complaints, each of which allegedly violates the

IFDA, but focus their discussion on the following:  GWBD's 1) plan to sell the least

desirable sales territories to Plaintiffs, and then to "live on" their routes to detect

performance shortfalls and errors that would allow GWBD to unfairly terminate their

franchises (Response at 21); 2) false and misleading statements to the Plaintiffs and

withholding material information with the intention and effect of inducing Plaintiffs to

purchase the franchises (Response at 23); and 3) omission of material terms from the

franchise agreements, including terms in contravention of Indiana's Franchise Laws,

which facilitated Weston's plan of wrongfully entrapping Plaintiffs in order to unjustly

terminate Plaintiffs' interests in their sales areas.  (Response at 24.)  GWBD does not

dispute the primary underlying fact that the Plaintiffs' Distribution Agreements and Sales

Areas are franchise agreements within the meaning of the Indiana Franchise Disclosure

Act, Ind. Code § 23-2-2.5.1, but contends that no actions on its part were in any way

violative of the Act.  Am. Comp. ¶ 58.

The Indiana Franchise Disclosure Act ("IFDA" or the "Act") governs offers for sale and sales of franchises in Indiana.  Section 27 of the Act prohibits franchisors from employing fraudulent schemes or from making false statements or material omissions in connection with offers or sales of franchises in Indiana:

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly:
>
> (1) to employ any device, scheme or artifice to defraud;
>
> (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or
>
> (3) to engage in any act which operates or would operate as a fraud or deceit upon any person.

I.C. § 23-2-2.5-27.  To establish a violation of section 27, "a private plaintiff must also prove that the misrepresentation or omission caused some harm to the plaintiff."

Enservco, Inc. v. Indiana Securities Div., 623 N.E. 2d 416, 423 (Ind. 1993).  In applying this statute, the Indiana Supreme Court has explained:

> To prove section 27(1) franchise fraud, one must show the alleged violator employed a "device, scheme or artifice" with the knowledge or intent that it might defraud another.

Enservco, 623 N.E.2d at 423.

> To establish a violation of section 27(2), one must prove the alleged violator, in connection with the offer, sale, or purchase of a franchise or in a filing with the Commissioner,

41

> made a false statement of material fact or omitted to state a
> material fact necessary in order to make statements made not
> misleading. Similarly, a violation of section 27(3) is
> established upon proof that the alleged violator engaged in an
> act which operates as a fraud or deceit upon any person.

Id. at 422.  Culpability is not an element of a section 27(2) or 27(3) violation.  Id. at 423.

For purposes of the IFDA, "fraud" and "deceit" are defined as:

> [A]ny misrepresentation in any manner of a material fact, any
> promise, or *representation or prediction as to the future not
> made honestly or in good faith*, or the failure or omission to
> state a material fact necessary to make the statements made,
> in the light of the circumstances under which they were made,
> not misleading.

I.C. § 23-2-2.5-1(f) (emphasis added).  A false statement or omission is "material" if

"there is a substantial likelihood that a reasonable investor would have viewed the

information as having significantly altered the total mix of available information."

Enservco, 623 N.E.2d at 423-425.  Private actions are limited under the IFDA to those

alleging fraud, deceit, or misrepresentation.  Cont'l Basketball Ass'n. Inc. v. Ellenstein

Enters., Inc., 669 N.E.2d 134, 137 (Ind. 1996).  "The elements of section 27(2) and (3)

are, in sum, a false statement or omission, materiality, and *harm caused by reliance* on

the statement or omission."  Enservco, 623 N.E.2d at 423-425 (emphasis added).

The IFDA requires proof of reasonable reliance.  Hardee's of Maumelle, Ark., Inc.

v. Hardee's Food Systems, Inc., 31 F.3d 573, 579 (7th Cir. 1994) (reporting district

court's finding that plaintiffs did not actually rely, or were not entitled to rely, on

Hardee's alleged misrepresentations when deciding to enter into the franchise agreement).

In Hardee's, the district court held that it would have been unreasonable for the Plaintiff to rely on Hardee's representations since he had signed a licensing agreement containing an integration clause. "[I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." Id. at 576. To survive summary judgment, Plaintiffs here must provide some evidence that "their harm was caused by reliance on a false statement." Hacienda Mexican Restaurant of Kalamazoo Corp. v. Hacienda Franchise Group, 641 N.E.2d 1036 (Ind. Ct. App. 1994) (reporting trial court's finding that "Franchisees failed to prove that Franchisor's representations as to the furture were not made honestly or in good faith." Id. at 1040.)

A large portion of the parties' briefings in the case at bar were devoted to Count III involving Plaintiffs' claims under the IFDA. Even so, it remains unclear from Plaintiffs' response to the motion for summary judgment precisely what harm they allege to have suffered. They do not, for example, articulate any specific harm arising from each alleged mistatement or omission. Plaintiffs state that, "[they] paid Weston hundreds of thousands of dollars to purchase equity interests in their sales areas. In making their investments, Plaintiffs placed their faith in the fact that they had worked with Weston [] for several years, and they believed that their working relationship with Weston had been a good one. In making their investments, Plaintiffs believed what they were told about being able to make their own business decisions and build their equity over time. . . ." Pls.' Resp. at 33. In summing up their argument, Plaintiffs assert "Ronald Wilson's franchise was terminated by Weston on February 28, 2006, while he was delivering

43

products to an O'Malia's.  Plaintiffs have been harmed as a result of their reliance on Weston's representations, material omissions and presumed good faith."  Pls. Resp. at 35 (internal citation omitted).  Beyond their bald assertion of injury, no evidence has been cited which would establish that the value of Plaintiffs' distribution rights decreased.  What alleged harm flowed from GWBD's alleged misstatements and omissions to Plaintiffs is entirely undeveloped in their arguments and briefings.  Such a wholesale lack of evidence of harm resulting from Defendant's omissions or misstatements exposes this claim to a grant of summary judgment in favor of Defendant on Count III of Plaintiffs' complaint.

In addition, as was true in Hardee's, supra, Weston's Distribution Agreement contains an integration clause at Section 11.4, which provides that "neither party shall be liable for any representation made to the other" and that the Agreement and other documents signed contemporaneously with the Agreement constitute the entire agreement between the parties, superseding all prior agreements, discussions and representations.  This provision, according to GWBD, prevents Plaintiffs from being able to demonstrate that they relied or were entitled to rely on the alleged misrepresentations or omissions, or that their reliance was legally reasonable.  Reply at 17.  We agree with GWBD's view here in light of the Seventh Circuit's holding in Hardee's, which states: it is "particularly unreasonable for [Plaintiffs] to rely on any of these representations since [they] had signed a [Distribution Agreement] containing an integration clause . . . ." 31 F.3d at 576.  Plaintiffs rejoin, arguing that Weston's Distribution Agreement cannot abrogate the

44

requirements of Section 27 of Indiana's Franchise Disclosure Act.  Response at 32.

However, it is clear to us that the integration clause does not abrogate the requirements of

Section 27; it simply recites that the parties' entire agreement is contained in the

Distribution Agreement.  Further, there simply is no evidence that the Plaintiffs' relied to

their detriment on any particular material mistatement made in the Distribution

Agreement.  For these reasons, summary judgment shall be <u>GRANTED</u> in favor of

Defendant on Count III.

### D.   INDIANA DECEPTIVE FRANCHISE PRACTICES ACT – COUNT IV

Plaintiffs next assert that GWBD violated the Indiana Deceptive Franchise

Practices Act ("IDFPA"), Ind. Code 5 23-2-2.7-1, et seq., based on the following: (1) the

Distribution Agreement contains a prospective release; (2) the Distribution Agreement

permits GWBD to terminate the franchise without good cause or in bad faith; (3) the

Plaintiffs were coerced into accepting products not required by the Distribution

Agreement; (4) the Plaintiffs were coerced into participating in promotional campaigns;

and (5) GWBD unfairly discriminated among franchisees.

GWBD argues that, with regard to each of these allegations, Plaintiffs have failed

to identify or establish a genuine issue of material fact and thus GWBD's Motion for

Partial Summary Judgment on Count IV of Plaintiffs' Amended Verified Complaint

should also be granted.  Reply at 18.

### 1.    The IDFPA Prohibits "Prospective Releases."

It is unlawful under Indiana's Deceptive Franchise Practices Act for any franchise

agreement to contain a provision "[r]equiring the franchisee to prospectively assent to a

release, assignment, novation, waiver, or estoppel which purports to relieve any person

from liability to be imposed by this chapter or requiring any controversy between the

franchisee and the franchisor to be referred to any person, if referral would be binding on

the franchisee. This subdivision does not apply to arbitration before an independent

arbitrator." Ind. Code § 23-2-2.7-1. Weston's Distribution Agreement contains the

following provision relating to the release:

> In the event of a sale or transfer by or for the account of
> DISTRIBUTOR or DISTRIBUTOR'S estate . . . the
> DISTRIBUTOR or the estate shall execute . . . a general
> release terminating, canceling and surrendering
> DISTRIBUTOR'S rights under this Agreement and releasing
> any and all claims against GWBD and its affiliates and its
> officers, directors, shareholders, employees, successors and
> assigns arising under or out of this Agreement . . .

(Distribution Agreement, §6.4 (emphasis added)). Pursuant to this provision included in

the Distribution Agreement, at the time of Plaintiffs Courtney's and Brown's sales of

their routes, GWBD tendered for execution a general release to each of them. (Dkt. 103,

GWBD's Amended Answer and Counterclaim, p. 21, ¶5). This release required Plaintiffs

Courtney and Brown to release Weston from:

> any claim, cause of action, right or interest arising out of
> RELEASOR's ownership of certain Distribution Rights
> previously purchased by RELEASOR pursuant to a certain

46

Bill of Sale previously executed between the parties and termination thereof, and

any claim, cause of action, right or interest arising out of RELEASOR's actions pursuant to a certain Distributor's Agreement previously entered into between RELEASOR and GWBD, and

any and all other actions, causes of actions, debts, sums of money, accounts, covenants, contracts, agreements, damages and any and all demands whatsoever which against GWBD, the RELEASOR, his heirs, executors, administrators and assigns have or have ever had.  (General Release).

The Distributors contend that this part of the Franchise Agreement as well as the tendered release itself violate the prohibitions of Ind. Code § 23-2-2.7-1(5), and are therefore unlawful.  Response at 36.

GWBD responds that the IDFPA (§ 23-3-2.7-1(5)) only prohibits a requirement that a franchisee "prospectively assent to a release" through a release agreement that is executed before the relationship commences and/or any potential liability has arisen and that it is incorrect to construe this portion of the Distribution Agreements and the tendered release as a prospective release.

Neither party cites any Indiana or Seventh Circuit case addressing prospective releases under Indiana's franchise laws and our independent research has found none. The issue before us distills into a question of what the Indiana General Assembly meant by the word "prospectively."  Our reading of Indiana Code Section 23-2-2.7-1 brings us to the conclusion that the statute prohibits any franchisor from requiring a franchisee to "assent to a release, assignment, novation, waiver, or estoppel which purports to relieve

47

any person from liability to be imposed by this chapter" any time prior to the franchisee's

assertion of a claim under which the franchisor could be subject to liability.  Accordingly,

"prospectively" means any time prior to a liability-incurring event.  Because both section

6.4 of the Distribution Agreement and the terms of the proffered release potentially

require the Distributors to agree to release their rights prior to incurring liability,

summary judgment for Defendant on this claim must be <u>DENIED</u>.

### 2.    The IDFPA Prohibits Termination without Good Cause.

Plaintiffs argue that GWBD violated Ind. Code § 23-2-2.7-1(7) based on the fact

that the Distribution Agreements did not specify the number of instances a Distributor

may ignore his/her contractual obligations or otherwise fail to perform under the

agreement before such breaches are considered chronic and thereby become grounds for

termination of their franchise.  Reply at 20.

Indiana statutes make it unlawful for any franchise agreement to contain

provisions that permit "unilateral termination of the franchise if such termination is

without good cause or in bad faith."  "Good cause," within the meaning of this

subdivision, includes any material violation of the franchise agreement.  Ind. Code §

23-2-2.7-1.

The Distributors argue that the provisions in Weston's Distribution Agreements

are vague and arbitrary, thereby allowing Weston to unilaterally terminate the Plaintiffs'

franchises without good cause.  Response at 37.  GWBD argues that Plaintiffs have

admitted numerous curable breaches of the Distribution Agreement in their Amended

48

Complaint, and in any event the IDFPA does not require GWBD to determine any specific number of breaches as giving rise to termination or other punitive response by it against the distributors who committed one or more breaches.  GWBD contends that the Distribution Agreement in all material respects complies with the IDFPA in that it does not contemplate or otherwise permit termination without good cause or in bad faith. (Reply at 20, citing Pls.' Am. Compl. 17 21, 23).

Our review of the distribution agreement and the manner in which it has been implemented leaves us with the clear sense that issues of material fact remain in dispute regarding the manner in which the Distribution Agreements have been applied as well as the precise meaning of "good cause" under the Agreements, and whether violation(s) of Ind. Code § 23-2-2.7-1(7) have occurred.  Thus, summary judgment on this claim must also be <u>DENIED</u>.

### 3.   The IDFPA Prohibits a Franchisor from Coercing a Franchisee into Ordering or Accepting Particular Goods.

The Indiana Deceptive Franchise Practices Act ("IDFPA") makes it unlawful for a franchisor to coerce a franchisee to:

> "order or accept delivery of any goods, supplies, inventories, or services which are neither necessary to the operation of the franchise, required by the franchise agreement, required by law, nor voluntarily ordered by the franchisee";  (Ind. Code § 23-2-2.7-2(1)(i)) or
>
> "participate in an advertising campaign or contest, any promotional campaign, promotional materials, display decorations, or materials at an expense to the franchisee over and above the maximum percentage of gross monthly sales or

the maximum absolute sum required to be spent by the
franchisee provided for in the franchise agreement; in the
absence of such provision for required advertising
expenditures in the franchise agreement, no such participation
may be required." (Ind. Code § 23-2-2.7-2(1)(iii)).

Here, Distributors argue that a genuine issue of material fact exists concerning
whether GWBD coerced certain of them into accepting delivery of unnecessary and
unordered product through the practice of "plussing up" as well as through the pallet
program. Response at 38. Under the Distribution Agreement, Plaintiffs are required to
"buy and accept . . . sufficient quantities of the Products to adequately and properly
supply the Outlets in the Sales Area," although the Distribution Agreement does not
define either what "adequate" or "proper" is. (Response at 38, citing Distribution
Agreement, §3.2). The Agreement does, however, provide that Plaintiffs are independent
contractors who retain "the right to operate the business as DISTRIBUTOR chooses, and
shall bear all risks and costs of operating such business."[6] (Response at 38, citing
Distribution Agreement, §2.3).

GWBD contends that no evidence has been adduced to show that Plaintiffs have
been required to purchase any goods that are not required by their Distribution
Agreements, and Plaintiffs' assertion that they should be free to exercise their

_____

[6] For example, Plaintiff Patti Clouse ceased stocking one of Weston's products in one of
her stores because this product was not selling in that location, and she wanted to make more
room for Weston products that did sell. Brian Short called Ms. Clouse and informed her that, if
she did not put that item back on the shelf, she would be in violation of her contract and could
be terminated. (Response at 39, citing P. Clouse, P.I. Tr., pp. 75-76.)

"independent business judgment" in selecting the mix and quantities that are placed in their customers' stores ignores the requirements of their own customers.  Reply at 20-21. GWBD asserts that the applicable provision of the Indiana Deceptive Franchise Practices Act was not intended to address Plaintiffs' expressed concerns, but rather to prevent a franchisor from requiring a franchisee to purchase items outside of the scope of the franchise agreement.  Id. at 21.

Based on the record before us, there remain material questions of fact regarding whether some Plaintiffs were required to purchase unordered product(s) as a result of GWBD's practice of "plussing up" or because of the pallet program.  We therefore deny summary judgment on this issue and shall allow the claim to go forward.

### 5.    Unfair Discrimination Between Franchisees.

The Distributors argue that there remain questions of material fact as to whether Weston unfairly discriminated against certain of the Plaintiffs when it selectively granted higher commissions to some franchisees compared to certain others and when it implemented its plan to terminate the so-called "under achievers."  Response at 15.

GWBD argues that, "[t]o survive GWBD's Motion for Partial Summary Judgment on their claim that GWBD unfairly discriminated among franchisees in violation of Indiana Code 5 23-2-2.7-2(5), Plaintiffs were required to present evidence that the franchisees involved were operating under similar financial and marketing conditions, that GWBD arbitrarily discriminated between them, and that the discrimination was

unfair." Reply at 22, citing <u>Canada Dry Corp. v. Nehi Beverage Co.</u>, 723 F.2d 5 12, 521 (7th Cir. 1983).

On this basis, GWBD maintains that Plaintiffs have failed to present any facts regarding the similarity of the marketing conditions between distributors that any alleged discrimination by GWBD was arbitrary and unfair. Reply at 22. Because no such facts have been adduced, GWBD argues, the Court must enter summary judgment on Plaintiffs' claims under Ind. Code § 23-2-2.7-2(5). <u>Id.</u>

This claim as well must be allowed to go forward because there is some evidence to the effect that all IOs (including those IOs who are not parties to this action) were initially presented with similar routes and agreements and that all IOs were subject to GWBD's marketing plans. This commonality of routes, agreements, and marketing plans creates a genuine issue of material fact regarding whether any alleged discrimination by GWBD among franchisees occurred and, if so, whether it was arbitrary and unfair. Summary judgment on this claim is DENIED.

### E.   BREACH OF CONTRACT – COUNT V

The Distributors argue that GWBD's continues to be in violation of its contracts with Plaintiffs each time it pays Plaintiffs only a 12% commission for distribution of Weston's private label products. Response at 41. While the Distribution Agreement is silent as to the amount of consideration to be paid to Plaintiffs, parol evidence arguably would establish that Plaintiffs were initially told that they would receive commissions of

21%, but later were told the commission would be 19%.[7]  Response at 41.  Patti Clouse

testified at the preliminary injunction hearing that "they told me it would never change,

and I believed them."  (Response at 42, citing P.I. Tr., p. 87, l. 6-7.)  Plaintiffs assert that,

because modification of the Distribution Agreement can only be done in writing and

signed by both parties, and no such document has been executed, there has been no

change to the terms of the Distribution Agreement that would permit Weston to pay

Plaintiffs the reduced rate of 12% commission.  (Response at 42, citing Distribution

Agreement, § 11.4.)

In addition, Plaintiffs contend that, by requiring them to participate in GWBD's

promotional campaigns without sufficient compensation, Weston has breached §5.2 of the

Distribution Agreement, which provides:

> DISTRIBUTOR hereby designates GWBD and its affiliates
> and GWBD hereby agrees to act, as DISTRIBUTOR'S agent.
> GWBD shall use commercially reasonable efforts to obtain
> from Chains authorization to sell Products in the Chains and
> information regarding the prices and terms at which the
> Chains would be willing to purchase Products for their
> Outlets, and GWBD will communicate the information
> concerning such authorizations, prices and terms to
> DISTRIBUTOR. . . . DISTRIBUTOR shall have the option to
> revoke the designation of GWBD as DISTRIBUTOR'S agent
> at any time on thirty (30) days notice.

Plaintiffs argue that GWBD, acting as Plaintiffs' agent, had a contractual duty to the

Plaintiffs to conduct such negotiations for promotions with the retail stores.  Response at

---

[7]  The operating pro forma did incorporate the 19% spread provision.  (GWBD's
SOMF at 4; citing UFOC, Ex. N).

42. GWBD allegedly breached that duty when it negotiated promotions with the chain stores that allegedly actually decreased Plaintiffs' income while increasing their expenses and efforts.

GWBD responds, arguing that, even if at present there are more GWBD products "on sale" than in October 2004, the fact remains that, for the majority of Plaintiffs, average net weekly sales, in dollars, have gone up compared to the average sales at the time they purchased their distribution rights. (Dkt. 124-1, Tomaszewski Aff., p.7).

In addition, Plaintiffs assert that GWBD breached the Distribution Agreements with Plaintiffs Ronald Wilson and Steve Tetrick when it terminated their franchises, because their alleged repeated violations of the Distribution Agreement terminations were not breaches of the Distribution Agreement under any reasonable standard. Response at 43. Clearly, factual disputes remain in this regard which foreclose the possibility of summary judgment on Count V of the Complaint.

## F.    CRIMINAL DECEPTION – COUNT VI

GWBD argues that it is entitled to summary judgment on this count "because Plaintiffs failed to identify any false or misleading written statements in their Amended Verified Complaint, their depositions or their discovery responses and because there is no evidence that GWBD knowingly or intentionally issued a false or misleading written statement." Reply at 23.

Plaintiffs respond by arguing that the Distribution Agreement is misleading in what it fails to address, namely, by omitting the prices Plaintiffs will be required to pay

for GWBD products.[8]  In addition, Plaintiffs claim that GWBD knew that it planned to

"live on the routes of Targeted Distributors" but nothing was included as to such a

practice in the Distribution Agreement.  Reply at 24.

GWBD's rejoinder to Plaintiffs' claims is that "Plaintiffs do not contend that these

documents contain false or misleading statements that GWBD knew to be false when

written.  Rather, Plaintiffs assert that the Distribution Agreement is misleading because it

does not set forth the spread that the Plaintiffs would receive from the sale of products, it

does not set forth a specific number of times a Plaintiff is permitted to breach the

Agreement, and it permits GWBD to determine whether Plaintiffs' customers are being

served properly."  Reply at 23.

Indiana Code § 35-43-5-3(a)(2) provides:

> Sec. 3(a) A person who:
> . . .
> (2) knowingly or intentionally makes a false or misleading
> written statement with intent to obtain property, employment,
> or an educational opportunity;
> . . .
> commits deception, a Class A misdemeanor.

The case law interpreting this statute is limited, but three elements can easily be

---

[8]  In their discovery responses, the Plaintiffs identified three documents allegedly containing false or misleading statements in violation of Ind. Code § 35-43-5-3(a)(2) (Indiana's criminal deception statute): the Distribution Agreement; the Closing Documents (the Offering Circular, the Distribution Agreement, and the Loan Documents); and the Breach Notices received by Plaintiffs.  Plaintiffs appear to have abandoned all but their allegations regarding the false or misleading statements contained in the Distribution Agreements.  Reply at 24.

distilled from the language of the statute itself.  First, the false or misleading statement must be in writing.  Second, the false or misleading statement must be made knowingly or intentionally.  Third, the false or misleading statement must be made with the intent to obtain property, employment, or an educational opportunity.  Here, Plaintiffs' claims fall short on all three elements.  First, there is no evidence of any written version of any false or misleading statement.  All of the statements about which Plaintiffs complain were omissions rather than written statements.  Second, there is no evidence that the any written portion of the Distribution Agreement (or any other agreement between the parties) was intentionally falsified by GWBD.  Finally, there is no evidence that GWBD made a false statement with the intention of obtaining property, employment, or an educational opportunity.  Plaintiffs do allege that Defendant sent breach notices with the intent to take the Distributor's property, to wit, their distribution routes, but there is no evidence that any statement made in the breach letters sent by GWBD to certain Distributors were knowingly or intentionally designed to be false.

The Distributors claims regarding these allegations thus cannot withstand summary judgment because the elements of criminal deception are plainly lacking.  Plaintiffs have failed to identify a false or misleading written statement made by GWBD with the intent to take Plaintiffs' property, that GWBD knew to be false or misleading at the time the written statement was made.  GWBD is entitled to summary judgment on Count VI of Plaintiffs Amended Verified Complaint.

### G.     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – COUNT VII

Plaintiffs argue that the conduct of GWBD employee, Brian Short, creates a genuine issue of material fact that precludes summary judgment as to the claim by Plaintiffs Mr. and Ms. Ray, Mr. Carrel, Ms. Courtney, Mr. Wilson, Mr. and Ms. Clouse, and Mr. Tetrick that, because of Short's behavior towards them, they sustained emotional distress.  GWBD asserts that there simply is no evidence that GWBD intended to cause these or any other Plaintiffs to suffer any emotional harm and GWBD is therefore entitled to summary judgment on Count VII of the Amended Complaint.  Reply at 26.

The tort of intentional infliction of emotional distress "arises when a defendant (1) engages in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another."  Bradley v. Hall, 720 N.E. 2d.747, 752 (Ind. Ct. App. 1999) (citing Doe v. Methodist Hosp., 690 N.E.2d 681, 691 (Ind. 1997)). To recover against an employer on an intentional infliction of emotion distress claim, the employer itself must be found to have intended the injury.  Holbrook v. Lobdell-Emery Mfg. Co.,  219 F.3d 598, 601 (7th Cir. 2000).  While "an intentional tort committed by a supervisor, manager or foreman could subject that individual to tort liability," such an intentional tort does "not necessarily expose the employer to liability."  Baker v. Westinghouse Elec. Corp., 637 N.E.2d 1271, 1275 (Ind. 1994) (rejecting a respondeat superior analysis in intentional infliction of emotional distress claims).  In order to impute tortious intent based on the conduct of an employee to an employer that is a legal entity or

57

artificial person, such as a corporation rather than an individual, the employee must establish either that "(1) the corporation is the tortfeasor's alter ego, or (2) the corporation has substituted its will for that of the individual who committed the tortious acts." Holbrook, 219 F.3d at 601, quoting Perry v. Stitzer Buick GMC, Inc., 637 N.E.2d 1282, 1287 (Ind. 1994).   A third option is for the plaintiff to show that "the individual who committed the tortious act was acting pursuant to a policy or decision made through the corporation's regular decision-making channels by those with authority to do so. Because the requisite level of intentionality must also exist, injury to the employee must be shown to have been the intended product of the policy or decision at issue." Perry, 637 N.E.2d at 1287.

GWBD can not be held liable for any alleged intentional infliction of emotional distress resulting from Brian Short's conduct, obnoxious as it apparently was.  The Distributors have offered no evidence that GWBD intended to cause the emotional distress allegedly suffered by Plaintiffs.  To establish the requisite intent by GWBD, Plaintiffs would need to adduce evidence to show either that Brian Short was GWBD's "alter ego" or that GWBD had substituted its will for that of Mr. Short.  Id.  There plainly is no evidence on either of these prongs–that Brian Short was the "alter ego" of GWBD, meaning that he owned and controlled the corporation, see Perry, 637 N.E.2d at 1287, or that GWBD substituted its will with the will of its employee, Mr. Short, such that Mr. Short's alleged improper conduct could be viewed as occurring "pursuant to a policy or decision made through the corporation's regular decision-making channels by those with

58

authority to do so." <u>Perry</u>, 637 N.E.2d at 1287.  In addition, Plaintiffs have failed to show that their alleged injuries were the intended product of any policy or decision at issue here.  <u>Perry</u>, 637 N.E.2d at 1287.

There being no evidence that GWBD intended that Plaintiffs suffer any emotional harm, GWBD is entitled to summary judgment on Count VII of the Amended Complaint.

## III.    CONCLUSION

Summary judgment is hereby <u>GRANTED</u> in favor of Defendant GWBD on Count I of the Amended Complaint as to the request for entry of a preliminary injunction, but a ruling is reserved as to whether Plaintiffs might be entitled to a permanent injunction on their remaining substantive claims.  GWBD's Motion for Summary Judgment is also hereby <u>GRANTED</u> on Count II of the Amended Complaint alleging antitrust violations, on Count III asserting violations of Indiana's Franchise Disclosure Act, Count VI alleging criminal deception, and Count VII alleging intentional infliction of emotional distress. Summary Judgment is hereby <u>DENIED</u> on the diversity jurisdiction claims, namely, all claims alleged in Count IV under the Indiana Deceptive Franchise Practices Act and the Count V, breach of contract claim.

**IT IS SO ORDERED.**

**Date:**  _09/25/2007_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Tony H. Abbott
POOL ABBOTT & FRYE LLP
tabbott@pafllp.com

Fred R. Biesecker
ICE MILLER LLP
fred.biesecker@icemiller.com

Donald F. Foley
FOLEY & TURNER
donf@foleyandturner.com

Dana L. Luetzelschwab
FOLEY & TURNER
danal@foleyandturner.com

Michael T. McNally
ICE MILLER LLP
mcnally@icemiller.com

Tonya J. Bond
PLEWS SHADLEY RACHER & BRAUN
tbond@psrb.com